IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM MILBRAND,<br>    Plaintiff | : <br> : <br> : | No. 4:17-cv-761 |
| v. | : <br> : <br> : | (Judge Kane) |
| WILLIAM MINER,<br>iudividually and in his official capacity,<br>and NATHAN RHODES, individually<br>and in his official capacity,<br>    Defendants | : <br> : <br> : <br> : <br> : | |

**MEMORANDUM**

Before the Court is a motion to dismiss Plaintiff William Milbrand's complaint filed by Defendants William Miner ("Miner"), and Nathan Rhodes ("Rhodes"). (Doc. No. 9.) For the reasons that follow, Defendants' motion will be granted.

**I.    BACKGROUND[1]**

Plaintiff's complaint arises out of criminal charges that were allegedly improperly filed against him and were ultimately dropped. (Doc. No. 1 ¶ 16.) At all times relevant to the complaint, Plaintiff was the duly elected Mayor of the City of Shamokin, Northumberland County, Pennsylvania, and also served as the President of the Shamokin Cemetery Association volunteering to maintain the Shamokin Cemetery. (Id. ¶ 11.) On or about January 31, 2017, the Defendants, police officers with the City of Shamokin Police Department, arrested Plaintiff, placed him in a police car, and drove him to the office of Magisterial Judge John Gembic in the City of Shamokin. (Id. ¶¶ 15-16.) On the same date, Defendant Miner filed a criminal complaint against Plaintiff, without review by the District Attorney of Northumberland County, alleging

---

[1] The following background is taken from the allegations of Plaintiff's complaint, (Doc. No. 1), and the exhibit attached to Plaintiff's Complaint (Doc. No. 1-1).

1

that Plaintiff desecrated burial lots in the Shamokin Cemetery. (Id.) The criminal complaint, attached as Exhibit A to Plaintiff's complaint, charges Plaintiff with fourteen (14) felonies and twenty-eight (28) misdemeanors. (Id.; Doc. No. 1-1 at 2-8.)

Specifically, the complaint charges Plaintiff with violating 18 Pa. C. S. A. § 3307(a)(2), Institutional Vandalism of a Cemetery or Facility, a felony, with regard to 14 individual graves in the Shamokin Cemetery. The statute provides, in relevant part:

> (a) Offenses defined. –A person commits the offense of institutional vandalism if he knowingly desecrates, as defined in section 5509 (relating to desecration or sale of venerated objects), vandalizes, defaces or otherwise damages:
>
>> (2) any cemetery, mortuary or any other facility used for the purpose of burial or memorializing the dead . . . .

18 Pa. C. S. A. § 3307. The complaint also charges Plaintiff with desecration of venerated objects and desecration of historic burial lots, both misdemeanors, in violation of 18 Pa. C. S. A. § 5509, with regard to each of 14 individual graves in the Shamokin Cemetery. That statute provides, in relevant part:

> Desecration, theft or sale of venerated objects
>
> (a) Offense defined. –A person commits a misdemeanor of the second degree if he:
>
>> (1) Intentionally desecrates any public monument or structure, or place of worship or burial;
>>
>> (2) Intentionally desecrates any other object of veneration by the public or a substantial segment thereof in any public place; . . .
>
> (a.1)   Historic burial lots and burial places. –A person commits a misdemeanor of the first degree if the person intentionally desecrates a historic burial lot or historic burial place.
>
> (b) Definitions. –As used in this section, the following words and phrases shall have the meanings given to them in this subsection:

> "Desecrate." Defacing, damaging, polluting or otherwise physically mistreating in a away that the actor knows will outrage the sensibilities of persons likely to observe or discover the action.
>
> "Historic burial lot." An individual burial site within a historic burial place. . . .

18 Pa.C.S.A. § 5509. Ultimately, all criminal charges against Plaintiff were withdrawn by the Northumberland County District Attorney on February 21, 2017. (Doc. No. 1 ¶ 16.)

Plaintiff alleges that the criminal complaint filed by Defendant Miner was false and fraudulent, as he maintains that Defendants Miner and Rhodes knew that he had not desecrated any graves at the Shamokin Cemetery, but instead filed criminal charges against him and arrested him in an effort to punish him. (Id. ¶¶ 16-17.) Specifically, Plaintiff alleges that, in his capacity as Mayor of Shamokin, he advised Defendant Miner that he could not authorize or vote for a pension for him based in part on accumulated sick leave and vacation time, as the Auditor General's office had previously cited the City of Shamokin for including sick time and vacation leave as part of pension awards to previously-retired police officers. (Id. ¶ 12.) Further, as to Defendant Rhodes, Plaintiff alleges that he wanted to "cause the Plaintiff harm for a number of reasons," including Plaintiff's vote to lay off Defendant Rhodes in 2004, Defendant Rhodes' wife's relation to Plaintiff's opponent in the upcoming mayoral race in the City of Shamokin, and what Plaintiff describes as a "grudge" held by Defendant Rhodes against Plaintiff. (Id. ¶ 13.)

Plaintiff alleges in his complaint that Defendant knew that he had not taken any action to deface or desecrate any graves at the Shamokin Cemetery, by virtue of Defendant Miner's conversation with Andrew Garancosky, whom Plaintiff alleges told Defendant Miner that he had never observed Plaintiff at the cemetery defacing any graves. (Id. ¶ 19.)

As part of the criminal complaint lodged against Plaintiff and attached as Exhibit A to his complaint, the Affidavit of Probable Cause ("Affidavit"), pursuant to which Plaintiff was arrested, contains the following statements regarding Defendant Miner's conversation with Mr. Garancosky:

> [T]his officer interviewed Andrew Garancoski. Garancoski was the caretaker of the Shamokin Cemetery from 2006-2013. He also served as President from 2008-2013 until he was replaced by the defendant, William Milbrand. Garancoski stated that he also observed several grave sites that had been disturbed and he had concerns regarding grave sites that may have been buried to make room for the cell tower site. He had many more concerns regarding the flow of money through the accounts of the Shamokin Cemetery. While he was President, he requested financial records regarding a trust with M&T Investment Group. Records were forwarded to him but they were intercepted by the secretary and never provided to him. Once other members became aware of his interests in the trust, he was immediately removed from the organization and replaced by Milbrand. He did provide this officer with a M&T Investment Group Asset Summary for the Shamokin Cemetery Company Account #431719202 in the amount of $149,852.94 as of 09/20/11. That was the only paperwork afforded to him. He stated There is also a checking account held at the First Colombia Bank & Trust 119 Northumberland Drive, Elysburg, PA 17824 (570)672-1500. Garancoski then reviewed the maps with me. He pointed out the area of construction and the graves he felt were damaged, covered or disturbed. He is willing to testify and will provide a full written statement regarding these facts.

(Doc. No. 1-1 at 10-11.)

The Affidavit also represents that the investigation which resulted in the criminal complaint filed against Plaintiff was initiated pursuant to a complaint lodged by Thomas S. Ward. As to Ward, the Affidavit provides:

> Ward stated that he frequently walks around the cemetery on a daily basis as part of his physical therapy. On October 16, 2016 he walked to the rear of the cemetery to check on the progress of the new cell phone tower that was supposed to be installed in that area. He discovered that headstones had been removed and graves were covered with dirt. He took photographs at that time. He stated that he had spoken to several people about the grave sites but no one had responded to him. He then felt the need to report it to the police. Ward emailed this officer (10) ten color photos. The photos clearly depict covered gravesites, headstones disrupted and one laying near a pile of freshly cut trees. (See attached photos) This officer then went to the location Ward had reported. It was clearly being

prepared for the cell tower site. It also appeared the construction intruded on several of the standing grave sites and may have possibly covered several of them.

(Id. at 10.)

The Affidavit further details the steps taken by Defendant Miner to investigate Ward's complaint:

> . . . this officer went to the cell tower site to view the area. I took (10) ten photos of the site. I also documented all of the names on the graves around the site to use as a reference point for when I reviewed the cemetery maps. I then returned to the station for a scheduled interview with the contractor who had done the work site work. Tim McAndrew, TM Services, arrived on station approximately 1235 hours. He was advised of the complaint and agreed to speak to this officer. McAndrew stated that he was contacted by Tri-Map Towers about the Shamokin Cemetery job. He had done (2) previous jobs for that company. He provided an estimate of $15,000 for the job. He stated that his bid was approved. He wasn't provided an[sic] further paperwork, blue prints, or plans for the site.
>
> In March 2016 he met Rocky Keim (Tri-Mac Rep) and William Milbrand at the site. Test holes were taken and Milbrand described the location to him. Milbrand advised him that he checked the cemetery maps and the area is clear of any grave sites. McAndrew again met with Milbrand in late July or early August to start the job. Milbrand advised him where to dig and assured him there were no grave sites in that area. McAndrew stated that he operated under Milbrand's advice because he was the President of the Shamokin Cemetery and he had checked the maps. . . . This officer then referred to the Shamokin Cemetery maps. Based on these known cemetery sites, it would be easy to determine if there were any burial sites in or around the current construction. I was unable to search by plot number so I had to go through all 16,000 names and deduce the location of their burial. The only area in question was block 23. . . . This officer logged every burial site in block 23. It was determined there were (2) two grave sites clearly buried under the new construction area. No head stones were visible and the map clearly identifies the graves of Joseph Smith 28NOV20 (23-8-18) and Flora Smith 21 JUL20 (23-8-18) in the new construction area. Those graves are East of the James and South of the Eveland grave sites. This officer determined the following grave sites were buried by the construction: Joseph Smith 28 NOV1920 (23-8-18), Flora Smith 21JUL1920 (23-8-18), Irene Eveland 13MAR 1917 (23-7-20), Katie Eveland 11NOV 1959 (23-7-19), and W. Atwater Eveland 23OCT 1973 (23-7-20). The following grave sites were altered or "disturbed": Merva Pensyl 11JAN31 (23-6-21), Albert Savery 24SEP47 (23-6-23), Agnes Pensyl 25MAY1962 (23-6-25), Frederick Pensyl 12OCT32 (23-6-25), Frederick Pensyl 01MAR39 (23-6-25), Margaret Pensyl 11JUL 19 (23-6-25), Arthur Pensyl 26JUN37 (23-6-27), Edna Pensyl 09AUG 76 (23-6-27) and lastly a war veteran killed in action 25DEC44 Ellsworth Pensyl (23-6-27).

5

(Id. at 11.)

Plaintiff filed the above-captioned action on April 28, 2017. (Doc. No. 1.) The Defendants were served with the complaint on June 22, 2017, and after requesting an extension of time from the Court, filed the instant motion to dismiss (Doc. 9), with supporting brief (Doc. No. 10), on August 25, 2017. Plaintiff filed his brief in opposition to Defendants' motion on September 15, 2017. (Doc. No. 13.) Accordingly, the motion is ripe for disposition.

## II.   LEGAL STANDARD

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests. Phillips v. Cnty. Of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008). The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief. Fed. R. Civ. P. 8(a). Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for its "failure to state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010). The Court's inquiry is guided by the standards of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). Under Twombly and Iqbal, pleading requirements have shifted to a "more heightened form of pleading." See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible. Id. The plausibility standard requires more than a mere possibility that the

defendant is liable for the alleged misconduct.  As the Supreme Court instructed in Iqbal, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under Twombly and Iqbal, the United States Court of Appeals for the Third Circuit has identified the following steps a district court must take when determining the sufficiency of a complaint under Rule 12(b)(6):  (1) identify the elements a plaintiff must plead to state a claim;  (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth;  and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief."  See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (citation and quotation marks omitted).

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010 (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,998 F2.d 1192, 1196 (3d Cir. 1993)).  A court may also consider "any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'"  Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d Ed. 2004)).

**III. DISCUSSION**

Plaintiff asserts three constitutional claims[2,3] and one state law claim against Defendants in their individual and official capacities. Counts 1 and 2 assert a false arrest claim against Defendants Miner and Rhodes; Count 4 asserts an abuse of process claim against both Defendants; Count 5 asserts a malicious prosecution claim against only Defendant Miner; and Count 3 asserts a state law claim for false light invasion of privacy against both Defendants.

**A. 42 U.S.C. § 1983 Claims**

Section 1983 is the vehicle by which private citizens can seek redress for violations of federal constitutional rights committed by state officials. See 42 U.S.C. § 1983. The statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Id. "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors." Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002)). To maintain a cause of action under Section 1983, a plaintiff must demonstrate that: (1) the conduct complained of was committed by persons acting under color of state law; and (2)

---

[2] While Plaintiff captions Count 1 as "Violation of Fourth and Fourteenth Amendments of the Constitution of the United States of America," and Count 2 as "False Arrest," the Court will consider those claims together, as one is redundant of the other, given that a constitutional claim for false arrest brought pursuant to 42 U.S.C. §1983 is premised on a violation of the Fourth Amendment.

[3] The Fourth Amendment, as incorporated into the Fourteenth Amendment, applies to the conduct of state officials. Mapp v. Ohio, 367 U.S. 643, 655 (1961).

the conduct violated a right, privilege, or immunity secured by the Constitution or laws of the United States. See Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 189 (3d Cir. 2005) (quoting West v. Atkins, 487 U.S. 42, 48 (1988)).

        1. Official Capacity Claims

Before addressing the individual claims brought by Plaintiff, the Court addresses Plaintiff's assertion of claims against Defendants in their official, as well as individual, capacities. Defendants argue that Plaintiff's claims against them in their official capacities are subject to dismissal for failure to state a claim upon which relief can be granted. (Doc. No. 10 at 11-12.) Defendants correctly note that an official capacity claim brought under Section 1983 is in effect a claim against the governmental entity employing the individual defendant. Kentucky v. Graham, 473 U.S. 159, 165-66 (1985); Brandon v. Holt, 469 U.S. 464, 471-73 (1985). Defendants also correctly note that a governmental entity, here the City of Shamokin, can be held liable for an employee's violation of a constitutional right under Section 1983 only if a plaintiff can show a policy or custom created by a policymaker that caused the alleged violation. Monell v. N. Y. City Dept. of Social Serv., 436 U.S. 658, 690-92 (1978); Natale v. Camden Cty. Corr. Facil., 318 F.3d 575, 583-84 (3d Cir. 2003) (citing Bd. of the Cty. Comm'rs of Bryan Cty., Okla. v. Brown, 520 U.S. 397, 404 (1997)). Defendants argue that since Plaintiff's complaint fails to include allegations regarding any policy or custom of the City of Shamokin that caused the alleged constitutional violations, Plaintiff's claims against Defendants in their official capacities should be dismissed. (Doc. No. 10 at 12.)

In response, Plaintiff argues at length that his official capacity claims are cognizable under the so-called "single incident" theory of Monell liability, based on the City of Shamokin's failure to train its police officers to properly determine probable cause. (Doc. No. 12 at 3-7.)

9

Plaintiff is correct that the Supreme Court has stated that the deliberate indifference required for Monell liability may be shown even in the absence of a pattern of violations in very limited situations. City of Canton, 489 U.S. 378, 390 n.10 (1989). However, for the single incident theory to apply, the complaint must contain sufficient allegations establishing that municipality's policymakers must "kn[e]w to a moral certainty" that the specific constitutional deprivation would occur as a result of the municipality's custom or policy. Id. Normally, a pattern of violations puts policymakers on notice that their custom or policy is inadequate, but in single incident cases, the policy's deficiency must be so obvious and the likelihood of constitutional harm so great, that notice to the policymakers may be assumed. Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011).

Here, aside from indicating in the caption of his complaint that he is pursuing claims against the Defendants in their official capacities, Plaintiff's complaint is devoid of even a bare reference to the City of Shamokin's policy or custom regarding training of its police officers. In fact, the entire thrust of the allegations in Plaintiff's complaint is not that the City of Shamokin police officers lack adequate training in determining the existence of probable cause, but rather that the two Defendants arrested him and initiated criminal proceedings against him "as a result of maliciousness and solely to punish the Plaintiff." (Doc. No. 1 at 4.) There are simply no allegations in Plaintiff's complaint that support a Monell theory of liability, even one premised on a "single incident." Accordingly, the Court will grant Defendants' motion to dismiss the official capacity claims asserted by Plaintiff.

    2. False Arrest

Under the Fourth Amendment, an arrest made without probable cause is a constitutional violation that may be redressed under Section 1983. However, in order to make out a false arrest

10

claim, a plaintiff must demonstrate: (1) that there was an arrest and (2) that the arrest was made in the absence of probable cause. Dowling v. City of Phila., 855 F.2d 136, 141 (3d Cir. 1988). Probable cause to support an arrest does not "require the same type of specific evidence of each element of the offense as would be needed to support a conviction." Adams v. Williams, 407 U.S. 143, 149 (1972). Rather, probable cause exists when the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" Johnson v. Campbell, 332 F.3d 199, 211 (3d Cir. 2013) (quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979)). In making a probable cause determination, a police officer is authorized to weigh the evidence and make credibility determinations, even if those decisions later prove incorrect. Eckman v. Lancaster City, 742 F. Supp. 2d 638, 650 (E.D. Pa. 2010), aff'd, 505 F. App'x 93 (3d Cir. 2013) and aff'd, 529 F. App'x 185 (3d Cir. 2013) (citing Wright v. City of Phila, 409 F. 3d 595, 603 (3d Cir. 2005)).

Where an arrest is made pursuant to a warrant, a plaintiff must plead facts demonstrating that (1) the officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant," and (2) that "such statements or omissions are material, or necessary, to the finding of probable cause.'" Wilson v. Russo, 212 F.3d 781, 786-87 (3d Cir. 2000) (internal quotation marks and citations omitted); Mitchell v. Obenski, 134 F. App'x 548, 551 (3d Cir. 2005) (quoting Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1997)) (noting that the fact that a magisterial district judge signed the warrant entitles the officers to a "presumption of reasonableness that can only be overcome by 'allegations of deliberate falsehood or of reckless disregard for the truth,' which must be accompanied by specific proof"). Omissions are made with reckless disregard "if an officer

withholds a fact in his ken that any reasonable person would have known that this was the kind of thing the judge would wish to know." Wilson, 212 F.3d at 788 (internal quotation marks and citations omitted). An officer is not required to "relate the entire history of events leading up to a warrant application with every potentially evocative detail." Id. at 787. In determining the alleged materiality of an assertion or omission, the court must "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." Wilson, 212 F.3d at 789.

In light of the fact that Plaintiff was arrested pursuant to a warrant issued by a magisterial district judge, supported by an Affidavit of Probable Cause drafted by Defendant Miner, the officers' actions here are entitled to a "presumption of reasonableness that can only be overcome by 'allegations of deliberate falsehood or of reckless disregard for the truth,' which must be accompanied by specific proof." Mitchell, 134 F. App'x at 551 (quotation omitted). As Defendants point out, and as previously described, the Affidavit prepared by Defendant Miner contains detailed evidence of a complaint from a citizen, Thomas Ward, Jr., regarding the condition of the graves in the cemetery, including photographs. (Doc. No. 1-1 at 10.) The Affidavit details Defendant Miner's investigation into the complaint, which included visiting the cemetery, reviewing the cemetery plan and developing information regarding gravesites that were either buried or disturbed by the construction of the cell phone tower. (Id.) The Affidavit details Defendant Miner's interview of Mr. Garancoski, who was the former caretaker of the Shamokin Cemetery. (Id.) As detailed more fully above, Garancoski stated that he observed graves that were disturbed in connection with the cell tower construction, and reviewed cemetery maps with Defendant Miner, pointing out areas of construction and graves he felt had been disturbed. (Id. at 11.) According to the Affidavit, Defendant Miner's investigation also included

12

meeting with the contractor who did the cell tower work, who indicated that he met with the Plaintiff at the site and that Plaintiff advised him where to dig in the cemetery, assuring him that no grave sites were located in that area. (Id.) Defendant Miner then plotted out which grave sites were affected by the construction, and ultimately identified fourteen graves that were affected. (Id.) In light of Plaintiff's position as President of the Shamokin Cemetery and reported involvement in directing the cell tower work in the cemetery, the Criminal Complaint prepared by Defendant Miner charged Plaintiff with a felony and misdemeanor counts relative to each of the fourteen graves because of his role in "authoriz[ing], allow[ing], and direct[ing]" the various gravesites to be covered by dirt in connection with the construction of a cell phone tower. (Id. at 2-8.)

As noted above, Counts 1 and 2 of Plaintiff's complaint allege in conclusory fashion that the Criminal Complaint and Affidavit pursuant to which Plaintiff was arrested were "false and fraudulent and not based on facts" because Defendants "knew that the Plaintiff took no action whatsoever to, in any way, deface or desecrate any graves." (Doc. No. 1 ¶¶ 16-17.) The only specific fact alleged in support of Plaintiff's claim that the Affidavit contained false statements is the complaint's allegation that that Mr. Garancosky told Defendant Miner that "he had never seen the Plaintiff at the cemetery." (Id. ¶ 19.) However, it is unclear to the Court how this allegation, even if true, demonstrates that any of the facts contained in the Affidavit were false, as the Affidavit and Criminal Complaint make no reference to Plaintiff's presence in the cemetery, and instead speak to Plaintiff in his capacity as President of the Shamokin Cemetery "authoriz[ing], allow[ing], and direct[ing]" the work that allegedly constituted desecration of the grave sites. (Doc. No. 1-1 at 2-8.) Plaintiff's complaint simply fails to allege that any specific facts contained in the Affidavit were false, or that the Affidavit omitted any exculpatory

13

information.  Accordingly, under the legal standard articulated above for probable cause challenges to an arrest executed pursuant to a warrant, Plaintiff's complaint fails to allege facts from which a reasonable factfinder could infer the absence of probable cause.

Having found the complaint to be lacking in allegations from which a reasonable inference could be drawn that Plaintiff's arrest and criminal prosecution were initiated in the absence of probable cause, the Court will grant the Defendants' motion to dismiss as it relates to Count 1 and 2's false arrest claim.  However, as it is unclear at this procedural stage whether amendment of this claim would be futile, the Court will permit Plaintiff leave to file an amended complaint to correct the identified pleading deficiencies.

3. Malicious Prosecution

In Count 5 of his complaint, Plaintiff asserts a Section 1983 claim for malicious prosecution against Defendant Miner.  In order to state a claim for malicious prosecution, a plaintiff must allege facts satisfying each of the following elements:

> (1) the defendant initiated a criminal proceeding, (2) the criminal proceeding ended in plaintiff's favor, (3) the defendant initiated the proceeding without probable cause, (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice and, (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

Johnson v. Knorr, 477 F.3d 75, 82 (3d Cir. 2007).

In light of the Court's finding supra that Plaintiff's complaint lacks allegations from which a reasonable inference could be drawn that Plaintiff's arrest and criminal prosecution were initiated in the absence of probable cause, the Court must find that Plaintiff's complaint fails to state a claim upon which relief can be granted for malicious prosecution, and will grant Defendants' motion to dismiss Count 5 claim against Defendant Miner.  However, as it is

14

unclear at this procedural stage whether amendment of this claim will be futile, the Court will permit Plaintiff leave to file an amended complaint to correct the identified pleading deficiencies.

4. Abuse of Process

With regard to the abuse of process claim asserted by Plaintiff in Count 4 of his complaint, the Court agrees with Defendants that such a claim is subject to dismissal, as it is clear from Plaintiff's complaint that he fails to state a cognizable claim for abuse of process against the Defendants. In contrast to false arrest and malicious prosecution claims, an abuse of process claim "lies where 'prosecution is initiated legitimately and thereafter is used for a purpose other than that intended by law.'" Rose v. Bartle, 871 F.2d 331, 350 n. 17 (3d Cir. 1989) (citation and quotation omitted).

With regard to abuse of process, Plaintiff's complaint alleges the following: "Defendants filed charges against the Plaintiff for a purpose other than [sic] what the criminal process is designed;" "Defendants brought charges against the Plaintiff in order to benefit themselves and to prejudice the Plaintiff;" "Defendants initiated criminal proceedings against the Plaintiff in retaliation . . . or for another improper purpose;" and "[t]he legal process used by the Defendants was not legitimate." (Doc. No. 1 ¶¶ 32, 35-37.)

According to these allegations, Defendants Miner and Rhodes initiated criminal proceedings against him for an improper or illegitimate purpose. Such allegations are fundamentally inconsistent with an abuse of process claim, which, at bottom, is premised on an allegation that legal proceedings initiated legitimately were thereafter used for an improper purpose. See Rose, 871 F.2d at 350 n.17. The allegations of Plaintiff's complaint, while potentially pertinent to a claim for false arrest or malicious prosecution, fail to state a claim upon

15

which relief can be granted for abuse of process. Accordingly, the Court will grant Defendants' motion to dismiss as it relates to Count 4's abuse of process claim with prejudice.

### B. State Law False Light Claim

In light of the Court's resolution of Defendants' motion to dismiss Counts 1, 2, 4, and 5 of Plaintiff's complaint, there is currently no viable federal claim before the Court supporting the exercise of supplemental jurisdiction over Plaintiff's state law claim. See Plasko v. City of Pottsville, 852 F. Supp. 1258, 1267 (E.D. Pa. 1994) ("[c]ourts should ordinarily decline to exercise supplemental jurisdiction over state law claim when the federal claims are dismissed") (citations omitted). Accordingly, the Court will decline to exercise supplemental jurisdiction over the state law false light claim asserted by Plaintiff in Count 3, and will dismiss it without prejudice to Plaintiff's ability to reassert the claim in an amended complaint pursuant to the Court's supplemental jurisdiction.

## IV. CONCLUSION

Based upon the foregoing, the Court will grant Defendants' motion to dismiss. Count 4 will be dismissed with prejudice. Counts 1, 2, 3 and 5 will be dismissed without prejudice, and Plaintiff will be granted leave to file an amended complaint with regard to those counts. Plaintiff will be granted thirty (30) days from the date of this Memorandum and corresponding Order to file an amended complaint that corrects the pleading deficiencies identified herein. An Order consistent with this Memorandum follows.