**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WILLIAM MILBRAND,** | : | |
| **Plaintiff** | : | **No. 4:17-cv-761** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **WILLIAM MINER,** | : | |
| **iudividually and in his official capacity,** | : | |
| **and NATHAN RHODES, individually** | : | |
| **and in his official capacity,** | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

Before the Court is a motion to dismiss Plaintiff William Milbrand's amended complaint

filed by Defendants William Miner ("Miner"), and Nathan Rhodes ("Rhodes").  (Doc. No. 19.)

For the reasons that follow, Defendants' motion will be granted.

## I.     PROCEDURAL AND FACTUAL BACKGROUND[1]

Plaintiff initially filed this action on April 28, 2017, arising out of criminal charges that

were allegedly improperly filed again him and later dropped.  The complaint asserted three

constitutional claims (false arrest, malicious prosecution, and abuse of process), against

Defendants Miner and Rhodes in their official and individual capacities as police officers with

the City of Shamokin Police Department, as well as a state law false light invasion of privacy

claim against both Defendants.  (Doc. No. 1.)  The Defendants filed a motion to dismiss the

complaint (Doc. No. 9), which the Court granted by Memorandum and Order on December 18,

2017 (Doc. Nos. 14, 15).

---

[1] The following factual background is taken from the allegations of Plaintiff's amended complaint (Doc. No. 16), and Exhibit A attached to Plaintiff's amended complaint (Doc. No. 16-1).

Specifically, in its Memorandum and Order, the Court dismissed Plaintiff's claims against Defendants Miner and Rhodes in their official capacities (which constitute claims against their employer, the City of Shamokin), for failure to include any allegations pertaining to the City of Shamokin's policy or custom regarding training of its police officers. (Doc. No. 14 at 10.) In addition, the Court dismissed Plaintiff's claims for false arrest and malicious prosecution, as it concluded that Plaintiff's complaint failed to contain any specific facts supporting Plaintiff's position that the affidavit of probable cause supporting Plaintiff's arrest contained false statements as would be required to state a claim for false arrest or malicious prosecution. (Id. at 10-15.) Because the Court could not conclude definitively that permitting Plaintiff the opportunity to amend his complaint would be futile, the Court afforded him a final opportunity to file an amended complaint to attempt to re-assert claims of false arrest and malicious prosecution. However, the Court dismissed with prejudice Plaintiff's abuse of process claim, finding that Plaintiff's theory that Defendants Miner and Rhodes arrested him for personal reasons was fundamentally inconsistent with a claim for abuse of process. (Id. at 15.) Finally, as Plaintiff had failed to state any viable federal claim in his complaint, the Court declined to exercise supplemental jurisdiction over Plaintiff's pendent state law claim, dismissing it without prejudice to Plaintiff's right to re-assert it in an amended complaint. (Id. at 16.)

Pursuant to the Court's December 18, 2017 Order, Plaintiff filed an amended complaint on December 21, 2017, re-asserting constitutional claims of false arrest and malicious prosecution against the Defendants[2] in their individual and official capacities and a state law false light invasion of privacy claim against them. (Doc. No. 16.) Shortly thereafter, Defendants moved to dismiss the amended complaint on January 19, 2018 (Doc. Nos. 19, 20). The motion

---

[2] Plaintiff asserts his malicious prosecution claim only against Defendant Miner.

has been fully briefed and is ripe for disposition.  Plaintiff's amended complaint contains the following additional allegations that attempt to further buttress the legal claims asserted in the original complaint.  The Court highlights those additional allegations below.

At all relevant times, Plaintiff was the duly elected Mayor of the City of Shamokin, Northumberland County, Pennsylvania, and also served as the President of the Shamokin Cemetery Association volunteering to maintain the Shamokin Cemetery.  (Doc. No. 16 ¶ 11.) On or about January 31, 2017, the Defendants, police officers with the City of Shamokin Police Department, arrested Plaintiff, placed him in a police car, and drove him to the office of Magisterial Judge John Gembic in the City of Shamokin.  (Id. ¶¶ 14-15.)  On the same date, Defendant Miner filed a criminal complaint against Plaintiff alleging that Plaintiff desecrated burial lots in the Shamokin Cemetery.  (Id. ¶¶ 14-16.)  The criminal complaint, attached as Exhibit A to Plaintiff's amended complaint, charges Plaintiff with fourteen (14) felonies and twenty-eight (28) misdemeanors.  (Id.;  Doc. No. 16-1 at 2-8.)

Specifically, the criminal complaint charges Plaintiff with violating 18 Pa. C.S.A. § 3307(a)(2), Institutional Vandalism of a Cemetery or Facility, a felony, with regard to 14 individual graves in the Shamokin Cemetery.  The statute provides, in relevant part:

> (a) Offenses defined. –A person commits the offense of institutional vandalism if he knowingly desecrates, as defined in section 5509 (relating to desecration or sale of venerated objects), vandalizes, defaces or otherwise damages:
>
>> (2) any cemetery, mortuary or any other facility used for the purpose of burial or memorializing the dead . . . .

18 Pa. C.S.A. § 3307.  The complaint also charges Plaintiff with desecration of venerated objects and desecration of historic burial lots, both misdemeanors, in violation of 18 Pa. C.S.A. § 5509, with regard to each of 14 individual graves in the Shamokin Cemetery.  That statute provides, in relevant part:

Desecration, theft or sale of venerated objects

(a) Offense defined. –A person commits a misdemeanor of the second degree if he:

    (1) Intentionally desecrates any public monument or structure, or place of worship or burial;

    (2) Intentionally desecrates any other object of veneration by the public or a substantial segment thereof in any public place; . . .

(a.1)    Historic burial lots and burial places. –A person commits a misdemeanor of the first degree if the person intentionally desecrates a historic burial lot or historic burial place.

(b) Definitions. –As used in this section, the following words and phrases shall have the meanings given to them in this subsection:

"Desecrate." Defacing, damaging, polluting or otherwise physically mistreating in a away that the actor knows will outrage the sensibilities of persons likely to observe or discover the action.

"Historic burial lot."  An individual burial site within a historic burial place. . . .

18 Pa.C.S.A. § 5509.  Ultimately, all criminal charges against Plaintiff were withdrawn by the

Northumberland County District Attorney on February 21, 2017.  (Doc. No. 16 ¶ 34.)

Plaintiff alleges in his amended complaint that Defendant Miner included false

statements and omitted relevant evidence from the Affidavit of Probable Cause ("Affidavit"),

prepared as part of the criminal complaint lodged against Plaintiff and pursuant to which he was

arrested.  (Doc. No. 16 ¶¶ 17-30.)  Plaintiff maintains that Defendants Miner and Rhodes knew

that he had not desecrated any graves at the Shamokin Cemetery, but instead filed criminal

charges against him and arrested him for personal reasons. (Id. ¶¶ 12-13, 16-30.)  With regard to

those personal reasons, Plaintiff alleges that, in his capacity as Mayor of Shamokin, he advised

Defendant Miner that he could not authorize or vote for a pension for him based in part on

accumulated sick leave and vacation time, as the Auditor General's office had previously cited

the City of Shamokin for including sick time and vacation leave as part of pension awards to

previously-retired police officers.  (Id. ¶ 12.)  Further, as to Defendant Rhodes, Plaintiff alleges

that he wanted to "cause the Plaintiff harm for a number of reasons," including Plaintiff's vote to

lay off Defendant Rhodes in 2004, Defendant Rhodes' wife's relation to Plaintiff's opponent in

the upcoming mayoral race in the City of Shamokin, and what Plaintiff describes as a "grudge"

held by Defendant Rhodes against Plaintiff.  (Id. ¶ 13.)

The Affidavit pursuant to which Plaintiff was arrested represents that the investigation

that resulted in the criminal complaint filed against Plaintiff was initiated pursuant to a complaint

lodged by a citizen of Shamokin, Thomas S. Ward ("Ward").  As to Ward, the Affidavit

provides:

> Ward stated that he frequently walks around the cemetery on a daily basis as part
> of his physical therapy.  On October 16, 2016 he walked to the rear of the
> cemetery to check on the progress of the new cell phone tower that was supposed
> to be installed in that area.  He discovered that headstones had been removed and
> graves were covered with dirt.  He took photographs at that time.  He stated that
> he had spoken to several people about the grave sites but no one had responded to
> him.  He then felt the need to report it to the police.  Ward emailed this officer
> (10) ten color photos.  The photos clearly depict covered gravesites, headstones
> disrupted and one laying near a pile of freshly cut trees.  (See attached photos)[.]
> This officer then went to the location Ward had reported.  It was clearly being
> prepared for the cell tower site.  It also appeared the construction intruded on
> several of the standing grave sites and may have possibly covered several of them.

(Doc. No. 16-1 at 10.)

The Affidavit further details the steps taken by Defendant Miner to investigate Ward's

complaint:

> . . . this officer went to the cell tower site to view the area.  I took (10) ten photos
> of the site.  I also documented all of the names on the graves around the site to use
> as a reference point for when I reviewed the cemetery maps.  I then returned to
> the station for a scheduled interview with the contractor who had done the [sic]
> site work.  Tim McAndrew, TM Services, arrived on station approximately 1235
> hours.  He was advised of the complaint and agreed to speak to this officer.
> McAndrew stated that he was contacted by Tri-Map Towers about the Shamokin
> Cemetery job.  He had done (2) previous jobs for that company.  He provided an

estimate of $15,000 for the job.  He stated that his bid was approved.  He wasn't provided an[y] further paperwork, blue prints, or plans for the site.

In March 2016 he met Rocky Keim (Tri-Mac Rep) and William Milbrand at the site.  Test holes were taken and Milbrand described the location to him.  Milbrand advised him that he checked the cemetery maps and the area is clear of any grave sites.  McAndrew again met with Milbrand in late July or early August to start the job.  Milbrand advised him where to dig and assured him there were no grave sites in that area.  McAndrew stated that he operated under Milbrand's advice because he was the President of the Shamokin Cemetery and he had checked the maps. . . .  This officer then referred to the Shamokin Cemetery maps.  Based on these known cemetery sites, it would be easy to determine if there were any burial sites in or around the current construction.  I was unable to search by plot number so I had to go through all 16,000 names and deduce the location of their burial.  The only area in question was block 23. . . .  This officer logged every burial site in block 23.  It was determined there were (2) two grave sites clearly buried under the new construction area.  No head stones were visible and the map clearly identifies the graves of Joseph Smith 28NOV20 (23-8-18) and Flora Smith 21 JUL20 (23-8-18) in the new construction area.  Those graves are East of the James and South of the Eveland grave sites.  This officer determined the following grave sites were buried by the construction:  Joseph Smith 28 NOV1920 (23-8-18), Flora Smith 21JUL1920 (23-8-18), Irene Eveland 13MAR 1917 (23-7-20), Katie Eveland 11NOV 1959 (23-7-19), and W. Atwater Eveland 23OCT 1973 (23-7-20).  The following grave sites were altered or "disturbed": Merva Pensyl 11JAN31 (23-6-21), Albert Savery 24SEP47 (23-6-23), Agnes Pensyl 25MAY1962 (23-6-25), Frederick Pensyl 12OCT32 (23-6-25), Frederick Pensyl 01MAR39 (23-6-25), Margaret Pensyl 11JUL 19 (23-6-25), Arthur Pensyl 26JUN37 (23-6-27), Edna Pensyl 09AUG 76 (23-6-27) and lastly a war veteran killed in action 25DEC44 Ellsworth Pensyl (23-6-27).

(Id. at 11.)

In his amended complaint, Plaintiff alleges that the information provided by McAndrew to Defendant Miner, as detailed in the Affidavit, is inaccurate.  Specifically, Plaintiff alleges that:

Plaintiff made several attempts to contact the contractor, Tim McAndrew ("McAndrew"), and construction company representative, Rocky Keim ("Keim"), at the outset of the construction project to ensure that no graves would be disturbed during construction of the cell phone tower and access road.

Neither McAndrew nor Keim responded to Plaintiff's repeated calls and construction of the access road was started without Plaintiff's knowledge.

Plaintiff never instructed McAndrew where to dig as he was advised that Keim would be directing the construction of the cell phone tower and access road.

Plaintiff never instructed or directed construction crews to cover the graves with dirt or damage the grave sites as alleged in Miner's affidavit of probable cause.

Plaintiff had no involvement in the actual construction of the cell phone tower or access road.

(Doc. No. 16 ¶¶ 18-22.)

The amended complaint further alleges that, as part of his investigation, Defendant Miner also interviewed Andrew Garancoski. The Affidavit contains the following statements regarding Defendant Miner's conversation with Andrew Garancoski[3]:

[T]his officer interviewed Andrew Garancoski. Garancoski was the caretaker of the Shamokin Cemetery from 2006-2013. He also served as President from 2008-2013 until he was replaced by the defendant, William Milbrand. Garancoski stated that he also observed several grave sites that had been disturbed and he had concerns regarding grave sites that may have been buried to make room for the cell tower site. He had many more concerns regarding the flow of money through the accounts of the Shamokin Cemetery. While he was President, he requested financial records regarding a trust with M&T Investment Group. Records were forwarded to him but they were intercepted by the secretary and never provided to him. Once other members became aware of his interests in the trust, he was immediately removed from the organization and replaced by Milbrand. He did provide this officer with a M&T Investment Group Asset Summary for the Shamokin Cemetery Company Account #431719202 in the amount of $149,852.94 as of 09/20/11. That was the only paperwork afforded to him. He stated there is also a checking account held at the First Colombia Bank & Trust 119 Northumberland Drive, Elysburg, PA 17824 (570) 672-1500. Garancoski then reviewed the maps with me. He pointed out the area of construction and the graves he felt were damaged, covered or disturbed. He is willing to testify and will provide a full written statement regarding these facts.

(Doc. No. 16-1 at 10-11.)

Plaintiff's amended complaint alleges the following facts regarding Miner and Garancoski's conversation:

Garancosky was adamant that Plaintiff had not disturbed any grave sites and that many of the headstones that were "damaged" had been in that condition for over

---

[3] While the Affidavit spells his name as "Garancoski," Plaintiff's amended complaint consistently refers to "Garancosky," spelled with a "y."

ten years, before he became caretaker, and the damage was unrelated to the construction of the cellphone tower and access road.

Garancosky never told Miner that he observed several graves that had been disturbed due to the construction of the cell phone tower.

This relevant evidence was omitted from Miner's affidavit of probable cause.

Miner threatened Garancosky and told him to "stick with him and I will protect you."

(Id. ¶¶ 28-31.) Plaintiff further alleges that "[n]o gravesites were covered and no headstones were ever removed as alleged in Miner's affidavit of probable cause." (Id. ¶ 25.) In addition, Plaintiff's amended complaint alleges that Defendant Miner never attempted to interview Plaintiff regarding his involvement in the construction project prior to filing the criminal complaint. (Id. ¶ 23.) Finally, Plaintiff's amended complaint alleges that:

Prior to applying for an arrest warrant, Miner sought the advice and approval of Northumberland County District Attorney Tony Matulewicz ("Matulewicz"), who requested additional evidence before filing charges.

Despite Matulewicz's request, Miner filed the charges.

(Id. ¶¶ 32-33.)

## II.     LEGAL STANDARD

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests. Phillips v. Cnty. Of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008). The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief. Fed. R. Civ. P. 8(a). Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for its "failure to state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff.  See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010).  The Court's inquiry is guided by the standards of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009).  Under Twombly and Iqbal, pleading requirements have shifted to a "more heightened form of pleading."  See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible.  Id.  The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct.  As the Supreme Court instructed in Iqbal, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under Twombly and Iqbal, the United States Court of Appeals for the Third Circuit has identified the following steps a district court must take when determining the sufficiency of a complaint under Rule 12(b)(6):  (1) identify the elements a plaintiff must plead to state a claim;  (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth;  and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief."  See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (citation and quotation marks omitted).

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well

as undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010 (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,998 F2.d 1192, 1196 (3d Cir. 1993)). A court may also consider "any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d Ed. 2004)).

## III.  DISCUSSION

As noted above, Plaintiff's amended complaint asserts two constitutional claims[4,5] and one state law claim against Defendants in their individual and official capacities. Counts 1 and 2 assert a false arrest claim against Defendants Miner and Rhodes; Count 4 asserts a malicious prosecution claim against only Defendant Miner; and Count 3 asserts a state law claim for false light invasion of privacy against both Defendants.

### A.  42 U.S.C. § 1983

Section 1983 is the vehicle by which private citizens can seek redress for violations of federal constitutional rights committed by state officials. See 42 U.S.C. § 1983. The statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the

---

[4] While Plaintiff captions Count 1 as "Violation of Fourth and Fourteenth Amendments of the Constitution of the United States of America," and Count 2 as "False Arrest," the Court will consider those claims together, as one is redundant of the other, given that a constitutional claim for false arrest brought pursuant to 42 U.S.C. §1983 is premised on a violation of the Fourth Amendment.

[5] The Fourth Amendment, as incorporated into the Fourteenth Amendment, applies to the conduct of state officials. Mapp v. Ohio, 367 U.S. 643, 655 (1961).

> jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Id.  "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors." Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002)).  To maintain a cause of action under Section 1983, a plaintiff must demonstrate that: (1) the conduct complained of was committed by persons acting under color of state law;  and (2) the conduct violated a right, privilege, or immunity secured by the Constitution or laws of the United States.  See Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 189 (3d Cir. 2005) (quoting West v. Atkins, 487 U.S. 42, 48 (1988)).

### 1.  Official Capacity Claims

Before addressing the individual claims brought by Plaintiff, the Court addresses Plaintiff's re-assertion of claims against Defendants in their official, as well as individual, capacities.   As before, Defendants argue that Plaintiff's claims against them in their official capacities are subject to dismissal for failure to state a claim upon which relief can be granted. (Doc. No. 20 at 14-19.)  Defendants correctly note that an official capacity claim brought under Section 1983 is in effect a claim against the governmental entity employing the individual defendant.  Kentucky v. Graham, 473 U.S. 159, 165-66 (1985);  Brandon v. Holt, 469 U.S. 464, 471-73 (1985).   Defendants also correctly note that a governmental entity, such as the City of Shamokin, can be held liable for an employee's violation of a constitutional right under Section 1983 only if a plaintiff can show a policy or custom created by a policymaker that caused the alleged violation.  Monell v. N. Y. City Dept. of Social Serv., 436 U.S. 658, 690-92 (1978); Natale v. Camden Cty. Corr. Facil., 318 F.3d 575, 583-84 (3d Cir. 2003) (citing Bd. of the Cty.

Comm'rs of Bryan Cty., Okla. v. Brown, 520 U.S. 397, 404 (1997)).  As detailed above, the Court previously dismissed Plaintiff's official capacity claims against the Defendants for failure to include any allegations pertaining to the City of Shamokin's policy or custom regarding training of its police officers.  (Doc. No. 14 at 10.)

In his amended complaint, Plaintiff has included additional allegations aimed at establishing a Monell claim based on the City of Shamokin's alleged failure to train its police officers to properly determine probable cause.  (Doc. No. 16 ¶¶ 37-45.)  Defendants argue that Plaintiff's attempt to allege a Monell failure to train claim consists of nothing but conclusory assertions, and therefore, Plaintiff's claims against Defendants in their official capacities should be dismissed.  (Doc. No. 20 at 17-19.)

In response, as before, Plaintiff argues at length that his "failure to train" official capacity claims are cognizable under the so-called "single incident" theory of Monell liability. (Doc. No. 21 at 8-15.)  Plaintiff is correct that the Supreme Court has stated that the deliberate indifference required for Monell liability may be shown even in the absence of a pattern of violations in very limited situations.  City of Canton, 489 U.S. 378, 390 n.10 (1989).  However, for the single incident theory to apply, the complaint must contain sufficient allegations establishing that a municipality's policymakers knew "to a moral certainty" that the specific constitutional deprivation would occur as a result of the municipality's custom or policy.  Id.  Normally, a pattern of violations places policymakers on notice that their custom or policy is inadequate, but in single incident cases, the policy's deficiency must be so obvious, and the likelihood of constitutional harm so great, that notice to the policymakers may be assumed.  Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011).  "Liability in single-incident cases depends on '[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools

12

to handle that situation will violate citizens' rights.'" Thomas v. Cumberland Cty., 749 F.3d 217, 223-24 (3d Cir. 2014) (citation omitted).

Plaintiff's amended complaint includes the following allegations in an apparent attempt to support a single-incident Monell failure to train theory:

> Shamokin failed to train its police officers to properly investigate criminal allegations and establish probable cause.

> Shamokin failed to train its police officers to consider material exculpatory evidence before making a probable cause determination.

> Shamokin failed to train its police officers to seek out and rely on the recommendations of the district attorney prior to bringing charges.

> Shamokin's failure to train its police officers to properly investigate criminal allegations and establish probable cause was highly likely to result in a violation of Plaintiff's constitutional rights.

> Shamokin's failure to train its police officers to seek out and rely on the recommendations of the district attorney prior to bringing charges was highly likely to result in a violation of Plaintiff's constitutional rights.

> The likelihood that the failure to train in these particular areas would result in a constitutional violation was so likely that Shamokin was deliberately indifferent to the need for more or different training.

(Doc. No. 16 ¶¶ 37-42.)

The Court agrees with Defendants that these allegations consist largely of conclusory assertions echoing the relevant legal standard without specific factual support. Further, and most fundamentally, as the Court stated in its previous Memorandum, any attempt by Plaintiff to assert a single-incident "failure to train" Monell theory against the City of Shamokin here is completely undercut by the thrust of the allegations in his amended complaint, which, as before, is not that the City of Shamokin police officers lack adequate training in determining the existence of probable cause, but rather, that these two specific police officers, Defendants Miner and Rhodes, arrested him and initiated criminal proceedings against him for personal reasons,

despite an alleged lack of probable cause.  (See Doc. No. 16 ¶¶ 12-13, 16-30.)  Plaintiff has

failed to allege facts from which a reasonable factfinder could infer that the City of Shamokin is

liable under Monell's single-incident "failure to train" theory, and therefore, the Court will grant

Defendants' motion to dismiss the official capacity claims asserted by Plaintiff with prejudice.

### 2.  False Arrest

Under the Fourth Amendment, an arrest made without probable cause is a constitutional

violation that may be redressed under Section 1983.  However, in order to make out a false arrest

claim, a plaintiff must demonstrate:  (1) that there was an arrest and (2) that the arrest was made

in the absence of probable cause.  Dowling v. City of Phila., 855 F.2d 136, 141 (3d Cir. 1988).

Probable cause to support an arrest does not "require the same type of specific evidence of each

element of the offense as would be needed to support a conviction."  Adams v. Williams, 407

U.S. 143, 149 (1972).  Rather, probable cause exists when the "facts and circumstances within

the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable

caution, in believing, in the circumstances shown, that the suspect has committed, is committing,

or is about to commit an offense."  Johnson v. Campbell, 332 F.3d 199, 211 (3d Cir. 2013)

(quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979)).  In making a probable cause

determination, a police officer is authorized to weigh the evidence and make credibility

determinations, even if those decisions later prove incorrect.  Eckman v. Lancaster City, 742 F.

Supp. 2d 638, 650 (E.D. Pa. 2010), aff'd, 505 F. App'x 93 (3d Cir. 2013) and aff'd, 529 F.

App'x 185 (3d Cir. 2013) (citing Wright v. City of Phila, 409 F. 3d 595, 603 (3d Cir. 2005)).

Where an arrest is made pursuant to a facially valid arrest warrant issued by a magisterial

district judge, a plaintiff's pleading obligation in asserting a claim challenging the existence of

probable cause is twofold.  Dempsey v. Bucknell Univ., 834 F.3d 457, 469 (3d Cir. 2016).  A

plaintiff must plead facts permitting an inference that (1) the officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood in applying for a warrant," id. (citing Wilson v. Russo, 212 F.3d 781, 787 (3d Cir. 2000)), and (2) "such statements or omissions are material, or necessary, to the finding of probable cause." Wilson, 212 F.3d at 787 (citation omitted); Mitchell v. Obenski, 134 F. App'x 548, 551 (3d Cir. 2005) (quoting Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1997)) (noting that the fact that a magisterial district judge signed the warrant entitles the officers to a "presumption of reasonableness that can only be overcome by 'allegations of deliberate falsehood or of reckless disregard for the truth,' which must be accompanied by specific proof"). Omissions are made with reckless disregard "if an officer withholds a fact in his ken that any reasonable person would have known that this was the kind of thing the judge would wish to know." Wilson, 212 F.3d at 788 (internal quotation marks and citations omitted). An officer is not required to "relate the entire history of events leading up to a warrant application with every potentially evocative detail." Id. at 787. In determining the alleged materiality of an assertion or omission, the court must "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." Wilson, 212 F.3d at 789.

In applying this standard to the set of facts alleged in the amended complaint, the Court addresses the amended complaint's new factual averments in turn. As an initial matter, the Court notes that the Affidavit prepared by Defendant Miner contains detailed evidence of a complaint from a citizen, Thomas Ward, Jr., regarding the condition of the graves in the cemetery, including photographs, which prompted Defendant Miner's investigation. (Doc. No. 16-1 at 10.) None of the additional alleged facts provided in Plaintiff's amended complaint cast any doubt on

citizen Ward's complaint or information provided by him, which formed the basis for Defendant Miner's investigation.

Next, the Court addresses Plaintiff's challenge to the adequacy of the investigation conducted by Defendant Miner, specifically, Defendant Miner's alleged failure to interview Plaintiff. (Doc. No. 16 ¶ 23.) This allegation does not alone negate or otherwise call into question the validity of the Affidavit prepared by Defendant Miner so as to support a false arrest claim. See Wheeler v. Wheeler, 639 F. App'x 147, 150 (3d Cir. 2016) (upholding district court's dismissal of plaintiff's malicious prosecution claim for failure to state a claim on the basis that plaintiff's amended complaint, consisting of allegations that the defendant officer refused to interview the plaintiff and his wife following the altercation, visit the scene of the incident with the plaintiff, and review plaintiff's medical records, "revolve around how the investigation was conducted," and do not "suggest that [defendant] lacked probable cause to believe that [plaintiff] committed the offenses with which he was charged"); Mitchell, 134 F. App'x 548, 551 (3d Cir. 2005) (noting that an allegation that a "police investigation could have been more thorough does not vitiate probable cause"); Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 790 n.8 (3d Cir. 2000) (explaining that the officer had probable cause to arrest based upon a credible report from a school principal who witnessed the alleged crime, and noting that the officer was not required to interview every possible witness).

Third, with regard to the amended complaint's allegations pertaining to the nature of Plaintiff's interaction with Tim McAndrew, such allegations appear to be designed to call into question the veracity of the information provided by the contractor overseeing the cell phone tower construction to Defendant Miner as to Plaintiff's role in directing the construction work at the cemetery, as Plaintiff newly alleges that he never spoke to McAndrew regarding the

construction of the cell phone tower and had no role whatsoever in directing the location or details of the cell phone tower's construction. (Doc. No. 16 ¶¶ 18-22.) As noted above, according to the Affidavit, Defendant Miner's investigation involved meeting with McAndrew, who indicated that he met with Plaintiff at the site and that Plaintiff advised him where to dig in the cemetery, assuring him that no grave sites were located in that area. (Doc. No. 16-1 at 11.) In order to permit an inference that Defendant Miner included the assertions of McAndrew in the Affidavit with a reckless disregard for their truth, Plaintiff would have to have alleged facts suggesting that Defendant Miner had "obvious reasons to doubt the truth of what [McAndrew was] . . . asserting." Wilson, 212 F.3d at 783. Here, even assuming the truth of Plaintiff's allegations as to the conversations between McAndrew and Plaintiff, Plaintiff's amended complaint contains no facts suggesting that Defendant Miner knew such information provided to him by McAndrew was false or had any reason to know such information was false. Accordingly, under the applicable legal standard, the allegations of Plaintiff's amended complaint in this regard do not call into question Defendant Miner's reliance on McAndrew's statements in support of the probable cause Affidavit.

Fourth, Plaintiff's amended complaint contains allegations that similarly appear to call into question the veracity of two of Garancoski's statements, as reported by Defendant Miner in the Affidavit. As detailed more fully above, the Affidavit provides that Garancoski, the former caretaker of the Shamokin Cemetery, stated that he observed graves that were disturbed in connection with the cell tower construction, and reviewed cemetery maps with Defendant Miner, pointing out areas of construction and graves he felt had been disturbed. (Id. at 11.) In support of his position that the Affidavit omitted material exculpatory evidence, Plaintiff alleges in the amended complaint that "Garancosky was adamant that Plaintiff had not disturbed

any grave sites and that many of the headstones that were 'damaged' had been in that condition for over ten years, before he became caretaker, and the damage was unrelated to the construction of the cellphone tower and access road," and "Garancosky never told Miner that he observed several graves that had been disturbed due to the construction of the cell phone tower." (Doc. No. 16 ¶¶ 28-31.) Assuming the truth of Plaintiff's allegations that Garancoski did not tell Defendant Miner that grave sites were disturbed in connection with the construction work at the cemetery, pursuant to the standard articulated above, were the Court to remove those statements from the probable cause Affidavit, the Affidavit as a whole – containing the details of citizen Ward's complaint, Defendant Miner's inspection of the cemetery property and examination of cemetery maps, as well as the witness statement of McAndrew – would still appear to support a finding of probable cause sufficient to justify the facially valid arrest warrant issued by Magisterial District Judge Gembic.

Finally, Plaintiff's amended complaint includes a new assertion that "[p]rior to applying for an arrest warrant, Miner sought the advice and approval of Northumberland County District Attorney Tony Matulewicz ("Matulewicz"), who requested additional evidence before filing charges. Despite Matulewicz's request, Miner filed the charges." (Doc. No. 16 ¶¶ 32-33.) At first glance, this allegation that a police officer would disregard a District Attorney's request for additional evidence before seeking an arrest warrant is extremely troubling on its face. Also troubling is the fact that Defendants fail to specifically address the significance of this new averment in their briefing on the motion to dismiss. Neither party has pointed the Court to any legal authority addressing a similar set of facts, and the Court has found none.

However, accepting the truth of the factual allegations of Plaintiff's amended complaint, and drawing all reasonable inferences therefrom in his favor, as the Court is required to do when

analyzing a motion to dismiss under Rule 12(b)(6), the Court is presented with allegations that: at some point prior to applying for an arrest warrant, Defendant Miner discussed his investigation with the District Attorney; the District Attorney requested additional evidence prior to Defendant Miner seeking an application for a warrant to arrest Plaintiff; and at some point after that conversation, Defendant Miner applied to a magisterial district judge for an arrest warrant, which was issued based on his Affidavit of Probable Cause. However, assuming arguendo that Plaintiff's inclusion of these allegations changes how the Court should view the facially valid arrest warrant issued here such that their inclusion would permit a reasonable inference that Defendant Miner lacked probable cause to arrest Plaintiff,[6] Plaintiff's amended complaint still fails to state a Section 1983 false arrest claim against the Defendants because under the facts alleged, qualified immunity bars Plaintiff's claim.

     a.   Qualified Immunity

Defendants argue that their motion to dismiss should be granted as they are entitled to qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). A right is "clearly established" if it "would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." Kopec v. Tate, 361 F.3d 772,

---

[6] As an initial matter, the Court notes that the allegations of Plaintiff's amended complaint asserting that Defendant Miner had a conversation with the District Attorney about his investigation contain no information regarding the timeframe of the alleged discussion relative to Defendant Miner's application for an arrest warrant. Accordingly, lacking any indication as to the timing of the alleged discussion or the facts presented in that discussion, the allegations do not necessarily permit the reasonable inference that the facts presented to the District Attorney were the same facts presented to the magisterial district judge in the Affidavit of Probable Cause.

776 (3d Cir. 2004) (quotation omitted). "If it would not have been clear to a reasonable officer what the law required under the facts alleged, then he is entitled to qualified immunity." Id. Stated differently, for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 131 S. Ct. at 2083. As the Supreme Court recently noted, "[t]his demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (citation omitted). Accordingly, to overcome an assertion of qualified immunity in the context of a motion to dismiss, "a plaintiff must sufficiently plead not only a violation of a constitutional right, but also a violation of a clearly established one." Bistrian v. Levi, 696 F.3d 352, 366 (3d Cir. 2012).

At the time of Plaintiff's arrest, it was clearly established that "an arrest could be made only on the basis of probable cause." Berg v. Cty. of Allegheny, 219 F.3d 261, 272 (3d Cir. 2000). The Third Circuit has held that "[w]hether it would have been clear to a reasonable officer that probable cause justified [an] arrest requires an examination of the crime at issue." Gilles v. Davis, 427 F.3d 197, 204 (3d Cir. 2005).

In this case, the statutes Plaintiff was charged with violating are: 18 Pa. C.S.A. § 3307(a)(2), Institutional Vandalism of a Cemetery or a Facility; and 18 Pa. C.S.A. § 5509, Desecration, Theft or Sale of Venerated Objects. Both statutes address the circumstances of an individual knowingly defacing or desecrating cemetery facilities or places of burial. See id. Defendant Miner's Affidavit of Probable Cause charged Plaintiff with violations of these statutes by virtue of his position as President of the Shamokin Cemetery Association and his alleged role in "authoriz[ing], allow[ing], and direct[ing]" the cell tower work which allegedly affected the relevant grave sites. The relevant statutes do not on their face address the issue of a potential

violation based solely on an individual's role in authorizing or directing the work of others to deface or desecrate cemetery facilities or grave sites.  Neither party has referred to Court to any relevant precedent addressing the application of these statutes under the circumstances of this case, and the Court has found none.

Pursuant to the United States Supreme Court's decision in White v. Pauly, 137 S. Ct. 548 (2017) (per curiam), the fact that a case presents a "unique set of facts and circumstances" is an important indication that the conduct at issue "did not violate a 'clearly established' right." White, 137 S. Ct. at 552.  The Supreme Court recently discussed the clearly established inquiry in connection with a probable cause determination in District of Columbia v. Wesby, 138 S. Ct. 577 (2018).  In noting the importance of establishing the rule allegedly violated with specificity in the Fourth Amendment context, the Court stated:

> Probable cause "turn[s] on the assessment of probabilities in particular factual contexts" and cannot be "reduced to a neat set of legal rules."  It is "incapable of precise definition or quantification into percentages."  Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in "the precise situation encountered."  Thus, we have stressed the need to "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment."  While there does not have to be "a case directly on point," existing precedent must place the lawfulness of the particular arrest "beyond debate."  Of course, there can be the rare "obvious case," where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances.  But "a body of relevant case law" is usually necessary to "'clearly establish' the answer" with respect to probable cause.

Wesby, 138 S. Ct. at 590 (citations omitted).

Assessing the facts alleged in Plaintiff's amended complaint against this legal standard, the Court readily finds that Plaintiff's amended complaint fails to plead that Defendant Miner, in arresting Plaintiff pursuant to a facially valid arrest warrant for violating the statutes at issue by virtue of his role in authorizing or directing the cemetery work, violated a clearly established

right. As noted above, neither party has referred the Court to any relevant precedent addressing the application of these statutes under similar circumstances, much less pointed the Court to "a body of relevant case law" clearly establishing that Defendant Miner lacked probable cause to arrest Plaintiff.[7] Put differently, the Court cannot say that it would have been clear to a reasonable officer in Defendant Miner's position "what the law required under the facts alleged," and therefore, the Court finds that Defendants Miner and Rhodes are entitled to qualified immunity as to Plaintiff's false arrest claim. See Kane v. Barger, No. 17-3027, 2018 WL 4000068, at * 7 (3d Cir. Aug. 22, 2018) (reiterating that a right is clearly established for purposes of qualified immunity so long as "there are sufficiently analogous cases that should have placed a reasonable officer . . . on notice that his actions were unlawful").

Accordingly, the Court will grant the Defendants' motion to dismiss Plaintiff's false arrest claim asserted against Defendants Miner and Rhodes in their individual capacities in Counts 1 and 2 of the amended complaint with prejudice.

### 3. Malicious Prosecution

In Count 4 of his amended complaint, Plaintiff asserts a Section 1983 claim for malicious prosecution against Defendant Miner. In order to state a claim for malicious prosecution, a plaintiff must allege facts satisfying each of the following elements:

---

[7] In his brief opposing Defendants' motion, Plaintiff cites Kelly v. Borough of Carlisle, 622 F.3d 248, 255 (3d Cir. 2010), and argues that the amended complaint's allegation that Defendant Miner sought the issuance of an arrest warrant against the legal advice of the District Attorney weighs against a finding of qualified immunity here. (Doc. No. 20 at 19.) As an initial matter, as the Court noted above, the very summary allegations of the amended complaint, which lack any indication of timing or the nature of the facts presented to the District Attorney, do not necessarily permit the reasonable inference that Defendant Miner sought the issuance of an arrest warrant against the legal advice of the District Attorney. In any event, even assuming arguendo that such an inference would be appropriate, the fact that the District Attorney may have had a different view of the facts presented to him than the magisterial district judge did only serves to support the Court's conclusion that "what the law required under the facts alleged" would not have been clear to a reasonable officer in Defendant Miner's position.

(1) the defendant initiated a criminal proceeding, (2) the criminal proceeding ended in plaintiff's favor, (3) the defendant initiated the proceeding without probable cause, (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice and, (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

Johnson v. Knorr, 477 F.3d 75, 82 (3d Cir. 2007). The only prong of this test disputed by the parties in the context of the pending motion is the third prong – whether Defendant Miner initiated the proceeding without probable cause, and if so, whether he is entitled to qualified immunity.

In light of the Court's finding supra that, even assuming arguendo that Plaintiff's amended complaint alleges facts from which a reasonable inference could be drawn that Plaintiff's arrest and criminal prosecution were initiated in the absence of probable cause, Plaintiff's amended complaint fails to plead that any right violated here was "clearly established," the Court must also find that Defendant Miner is entitled to qualified immunity on Plaintiff's malicious prosecution claim. Therefore, the Court will grant Defendants' motion to dismiss Count 4 of Plaintiff's amended complaint with prejudice.

### B. State Law False Light Invasion of Privacy

The remaining count in Plaintiff's amended complaint asserts a state law claim for false light invasion of privacy. (Doc. No. 16 at 10-11.) Where a district court dismissed all claims over which it has original jurisdiction, as is the case here, the Court may decline to exercise supplemental jurisdiction over the pendent state law claim. 28 U.S.C. § 1367(c)(3). The Court's decision regarding the exercise of supplemental jurisdiction is one that should be based on "the values of judicial economy, convenience, fairness, and comity." Carnegie Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988). Ordinarily, when all federal law claims have been dismissed and only state-law claims remain, the balance of these factors indicates that the remaining claims

properly belong in state court.  Id.  In the absence of a viable federal claim, and finding nothing

to distinguish this case from the ordinary one, the Court finds the balance of factors in this case

"point[s] toward declining to exercise jurisdiction over the remaining state law claims."  See

Cohill, 484 U.S. at 350 n. 7.  Accordingly, the Court will dismiss Plaintiff's state law claim

without prejudice pursuant to 28 U.S.C. § 1367(c)(3).[8]

## IV.     CONCLUSION

Based upon the foregoing, the Court will grant Defendants' motion to dismiss in its

entirety.  Counts 1, 2, and 4 will be dismissed with prejudice.  Count 3 will be dismissed without

prejudice to Plaintiff's ability to assert the claim in state court.  An Order consistent with this

Memorandum follows.

---

[8] The Court notes that when a district court declines to exercise supplemental jurisdiction over
state law claims, the statute of limitations is tolled while the federal suit is pending and for a
period of 30 days after the suit is dismissed.  28 U.S.C. § 1367(d) ("The period of limitations for
any claim asserted under subsection (a) . . . shall be tolled while the claim is pending and for a
period of 30 days after it is dismissed unless State law provides for a longer tolling period.");
see Hedges v. Musco, 204 F.3d 109, 123-24 (3d Cir. 2000).